# In the United States Court of Federal Claims

No. 21-1931
(Filed: June 23, 2025)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TIMOTHY MOORE,

       *Plaintiff,*

v.

THE UNITED STATES,

       *Defendant.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Peter B. Broida*, Arlington, VA, for plaintiff, Timothy Moore.

*Tate N. Walker* and *Kara M. Westercamp*, Trial Attorney and Senior Trial Counsel, United States Department of Justice, Commercial Litigation Branch, Washington, D.C., with whom were *Yaakov M. Roth*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Deborah A. Bynum*, Assistant Director, for the defendant. *Daniel Garry*, Senior Counsel, Office of the General Counsel, Securities and Exchange Commission, of counsel.

## OPINION

BRUGGINK, *Senior Judge.*

This is an action brought pursuant to the Equal Pay Act of 1963. Pub. L. No. 88-83, 77 Stat. 56 (codified at 29 U.S.C. § 206(d)). In 2014, the Securities and Exchange Commission ("SEC") launched a pay transition program ("pay program") to remedy a disparity in how it paid its employees. To apply to the program, SEC employees could submit up-to-date resumes to an SEC committee, which would then decide whether the employees' experience merited a pay raise. Applying employees generally got a pay raise; nonapplying employees did not.

Plaintiff, a SEC employee named Timothy Moore, sued here and argued that the SEC violated the Equal Pay Act by paying two female employees (who applied to the pay program) more than him (who did not). After an earlier motion to dismiss, Federal Circuit appeal, and discovery, defendant has now moved for summary judgment. The matter is fully briefed, and the court heard oral argument on June 9, 2025. We hold that the SEC did not violate the Equal Pay Act because Moore's lower pay resulted from a sex-neutral factor: his failure to apply to the pay program.

BACKGROUND

I.      The Pay Program

Until 2002, the SEC followed the General Schedule when setting employee pay. App. 150.[1] That year, in response to high SEC staff turnover, Congress passed the Pay Parity Act, which enabled the SEC to create its own pay system. *See* Investors and Capital Markets Relief Act, Pub. L. No. 107-123, 115 Stat. 2390 (2002) (codified at 5 U.S.C. § 4802 *et seq*). At first, the SEC based new employees' pay on their previous salaries. App. 150. But in 2012, the SEC changed its pay system again and linked new employees' pay to their years of relevant and specialized experience. App. 150.

That created another problem. Employees hired before the 2012 pay adjustment were still paid based on their previous salaries. App. 150. By contrast, employees hired after the 2012 pay adjustment were paid based on their experience. App. 150. So the SEC ended up paying pre-2012 employees less than comparable post-2012 employees. *See* App. 150.

To fix the problem, the SEC and the National Treasury Employees Union ("Union") negotiated a new compensation agreement for SEC employees. *See* App. 161–89. The SEC and the Union memorialized the agreement in a Memorandum of Understanding, which established the pay program for all SEC staff. App. 167–71.

SEC employees could—but were not required to—apply to the pay program. *See* App. 110. If employees chose to apply, they would submit up-to-date resumes to an SEC SharePoint. App. 110–11. An up-to-date resume

---

[1] All "App." citations are to the appendix attached to defendant's summary judgment motion.

2

would "identify all years of experience . . . in sufficient detail for the [pay transition] committee to evaluate."  App. 200.

The submitted resumes went to the SEC Office of Human Resources ("Human Resources").  App. 94 (Dingman Tr. 20:20–21:3).  Augmented by compensation specialists from Towers Watson (a consulting firm), Human Resources performed "an initial analysis of applications."  App. 168.  During the initial analysis, Human Resources reviewed applicant resumes, assessed relevant and specialized experience,[2] and entered the years of relevant and specialized experience into the SEC's pay matrix, which generated salaries for the applicants.  App. 111, 113, 115 (Smith Tr. 19:6–21, 28:6–10, 37:18–21).

After completing its review, Human Resources forwarded its "analysis and recommendation" to the Pay Transition Committee ("Committee").[3]  App. 168; *see also* App. 94 (Dingman Tr. 20:20–21:3). The Committee reviewed applicants' resumes to decide whether "applicant[s] [met] the criteria for a pay adjustment and, if so, the amount of the salary adjustment."  App. 168.  Human Resources' recommendations did not bind the Committee, and the Committee could (and often did) reach its own conclusions on what relevant and specialized experience applicants possessed.  App. 116–17 (Smith Tr. 41:21–42:2, 45:4–21).

The Committee placed a premium on applicants' resumes.  App. 168. The resumes included employees' complete work history, job titles, duties for each job, job dates, and full-time or part-time status.    App. 195. In essence, the resume was "really the defining document to help [the SEC] better understand the experience that the employee was bringing to their application," and it enabled the SEC to "quantify and qualify [applicants'] relevant and specialized experience."  App. 101 (Dingman Tr. 47:18–22).

---

[2] Relevant experience is experience unrelated to an employee's duties but "which nonetheless prepare[d] the candidate for success" as an SEC employee.  App. 176.  Specialized experience is "technical experience that equip[ped] a candidate with the skill and knowledge to successfully perform the duties of a position and is directly related" to position duties.  App. 176.

[3] Each SEC division and office had its own Committee made up of two Union-selected members and two SEC-selected members.  App. 154, 167. For simplicity, we follow the parties' practice and refer to a singular Committee.

The Committee's lack of a viable alternative to the resumes confirms their "defining" status. While the Committee could access applicants' personnel files, consulting those documents had several downsides. App. 101 (Dingman Tr. 48:10–25). One problem was that SEC personnel files were typically scant on detail when it came to describing the work done by SEC employees. App. 102 (Dingman Tr. 50:19–51:6). For example, standard personnel documents, like the Standard Form 50, had "no details of the position, the duties of position, or anything like that." App. 122 (Smith Tr. 63:18–19). Another issue with manually reviewing employees' personnel files was that it "was just not a feasible thing" to do, given the Committee's limited personnel. App. 102 (Dingman Tr. 50:2–14). Nor would stitching together a patchwork picture of the applicants' work history give "employee[s] the best opportunity to be considered for the program." App. 102 (Dingman Tr. 50:2–14). All told, without applicants' resumes, the Committee "would have been speculating at best as to whether or not they had the necessary experience to be put through the application process." App. 101 (Dingman Tr. 47:22–48:1).

Once the Committee finished its work, it sent its recommendations to the SEC Chief Human Capital Officer, Lacey Dingman. App. 94 (Dingman Tr. 21:4–5). She did the final review of Human Resources' and the Committee's recommendations and approved any pay adjustments. App. 169.

Given the SEC's size (over 3,000 employees in 2014), the pay program necessarily had limits. App. 94 (Dingman Tr. 18:6–8). One limit was that the SEC intended for the program "to benefit employees by comparing actual employee salaries to the salaries employees would receive if they were newly hired," but not "to equalize the salaries of employees with similar experiences . . . ." App. 167.

The SEC also imposed eligibility requirements. Ineligible employees included those that (1) had been disciplined within a year of the program; (2) received an "unacceptable" performance rating; (3) had a performance improvement plan; (4) already had his or her pay set using the 2012 pay system, or (5) would not, under the program, receive a pay increase of more than 5%. App. 404.

4

The SEC further limited the pay program's application period to "no more than 15 work days." App. 168. The SEC needed that time limit because of the program's unknown costs. Although the SEC estimated that the program would cost around $3 million, it could not be sure. App. 152, 169. Indeed, the SEC could not account for numerous (and unknowable) variables, such as the number of applicants and how many would have the requisite experience for a pay raise. App. 160. Those factors "made it impossible to calculate, and difficult to approximate, the total cost of pay transition," which would likely strain the SEC's "limited budget." App. 102 (Dingman Tr. 51:14–15); App. 160.

In addition, the program required a substantial personnel commitment. Nearly one hundred people—across "every regional office and business area," not to mention Towers Watson consultants (who were another financial cost)—worked on the program, stretching the SEC's personnel thin. App. 102 (Dingman Tr. 52:7–17). As a result, the SEC could not afford to "continuously go through [the pay transition] process from a budgetary perspective and from a resourcing perspective." App. 102 (Dingman Tr. 51:22–25, Tr. 52:23–25) ("[I]t would have been very difficult to keep offering the program over and over again.").

Thus, the SEC adopted a three-week application period to run from September 22, 2014, to October 10, 2014. That way, SEC employees would have "the same opportunity" to have their pay revaluated while avoiding a protracted process. App. 102 (Dingman Tr. 51:15–18, 52:19–25). Absent a narrow exception, the SEC would only consider applications that timely went "through the application process." App. 93 (Dingman Tr. 15:22–23). The narrow exception was that the SEC allowed employees to submit a resume late for good cause. App. 198. Good cause consisted of evidence that employees were unable to apply during the three-week open season. App. 198. Absent good cause, the SEC would not consider late applications or those without a resume. *See* App. 23.

The SEC prepared its staff for the pay program by issuing three notices. The SEC announced the program in August 2014. App. 193. Next, the SEC advertised the program's opening on September 22, 2014. App. 194. Finally, in response to questions about the program, the SEC posted a "frequently asked questions" ("FAQ") page on its website, *SEC Today*, on September 29, 2014. App. 196, 198–202. The SEC also distributed the FAQ page to staff through emails. App. 101 (Dingman Tr.

47:9–14).  On the same day, the SEC extended the application deadline from October 10, 2014, to October 14, 2014.  App. 197.

After the pay program's application period closed on October 14, 2014, Human Resources and Towers Watson consultants reviewed the 1,622 applications.  App. 159.  They allowed 10 of the 1,622 to apply "after the open season deadline because those employees were either on maternity leave or sick leave during the entire open season."     App. 157. Those employees missed the SEC's notices about the program, which supplied good cause for not applying by the application deadline.  App. 99 (Dingman Tr. 39:17–40:21).     Human Resources added the good-cause applicants to the applicant pool in November and December 2014 and processed their applications along with the standard applicants.  App. 157. Human Resources and the Committee completed their review in June 2015, and the SEC fully funded the pay transition program with $21 million. App. 95 (Dingman Tr. 22:17–20), 156, 238–39.

II.     Moore, Monahan, and Curley at the SEC

A.  Their History and Duties at the SEC

Moore joined the SEC in 2008 as an attorney advisor.  App. 191.  The SEC assigned Moore to the Office of Market Oversight, Office of Self-Regulatory Organizations ("SROs") within the overarching Office of Compliance Inspections and Exams ("OCIE").  App. 191.  In 2009, the SEC promoted Moore to a senior counsel (SK-14) position.  App. 192.  In 2012, the SEC promoted Moore again, this time to a supervisory exam manager (SK-15) position.  App. 192.  In 2014, the SEC disbanded the Market Oversight Group.  App. 132 (Moore Tr. 21:3–4).  Moore then moved to the Financial Industrial Regulation Authority and Securities Industry Oversight Group ("FISO").  App. 132–33 (Moore Tr. 21:4–6, 22:6–7, 11–13).

The SEC describes a supervisory exam manager as a "senior legal advisor" who is "responsible for a specialized area of expertise related to compliance inspections and examinations."  App. 215.  The exam manager position description states that an exam manager's tasks include:

- Providing expert legal advice for sensitive and complex programs, including SROs.  App. 215.
- Planning, assigning, and reviewing subordinates' work.  App. 215.

6

- Helping select and hire new personnel.  App. 215.
- Supporting employee training and setting performance standards.  App. 215.
- Conducting inspections and examinations.  App. 216.
- Developing new exam procedures.  App. 216.
- Reviewing private firm compliance.  App. 216.
- Developing and providing technical legal advice and guidance, interpreting legislative and regulatory developments, and helping formulate new regulations and policy.  App. 216.
- Serving as a legal resource for SEC managers, the securities industry, and the public.  App. 216.
- Delivering briefings and speaking at staff meetings and conferences on behalf of the SEC.  App. 216.

Moore has specific duties beyond those listed in the position description.  As gleaned from his supervisor evaluations, his duties include:

- Serving as the FSIO newsletter coordinator, meaning that he handles publishing the monthly newsletter.  App. 717, 740–41, 761.
- Overseeing tips, complaints, and referrals ("TCRs") and determining appropriate responses and dispositions.  App. 692, 717, 740.
- Setting regular meetings with his exam team.  App. 341, 687, 739–40, 761.
- Setting exam team deadlines.  App. 361, 690, 717.
- Planning and scoping examinations.  App. 361.
- Drafting, editing, and reviewing documents for oversight reviews, examination documents, deficiency letters for SROs, and Section 31 inspections.  App. 341–42, 361–62, 689–90, 717.
- Entering examination documents into the TRENDS[4] database.  App. 362.
- Managing controlled foreign corporation donation processing, coordinating controlled foreign corporation keyworkers,

---

[4] Tracking and Reporting Examination National Documentation System ("TRENDS") Cloud.  *See Privacy Impact Assessment (PIA)*, SEC.gov (Mar. 5, 2025), https://www.sec.gov/files/pia-trendscloud.pdf.

handling publicity, and arranging controlled foreign corporation events. App. 687.

- Performing entrance and exit SRO interviews. App. 341, 361–62, 689, 762.

Katherine Monahan is another SEC supervisory exam manager. App. 67–68. Originally, she worked in the same practice group as Moore. *See* App. 139 (Moore Tr. 48:14–49:10). After that group dissolved, she joined the Broker-Dealer Exchange Group in OCIE. App. 366, 483, 894. Her duties include:

- Drafting, reviewing, and editing scope memoranda, document requests, onsite interview questions, planning memoranda, inspection reports, deficiency letters, TCR closing memoranda, Section 31 inspection reports, and other written work. App. 480, 483, 849, 851, 868, 914–15.
- Drafting the monthly newsletter. App. 480, 483, 867, 917.
- Performing onsite entrance and exit interviews. App. 480, 483, 915.
- Reviewing and summarizing NYSE corporate and financial compliance operating reports. App. 483.
- Analyzing and overseeing SRO TCRs and Section 31 inspections. App. 483, 849, 851–52, 857, 867, 893–94.
- Coordinating meetings and setting deadlines for subordinates. App. 849, 914.
- Training new staff on how to use TRENDS. App. 870.

Christine Curley is also a SEC supervisory exam manager. App. 263. She works in FSIO with Moore, but they are "not staffed on projects together." App. 495, 500. Unlike Moore, she manages an "essentially full-time workload on a part-time schedule"[5] and works "28 hours per week." App. 501. Her duties include:

- Reviewing qualified contingent trades. App. 794–95.
- Drafting, editing, and reviewing interview questions, scope memoranda, close-out letters, exit outlines, deficiency letters,

---

[5] The record is not clear on what this means (or how she does it), nor why Curley, as a part-time employee, is paid more than Moore and Monahan, who are full-time employees.

final exam reports, and document requests.  App. 506–07, 525, 531, 787–88, 798, 814.
- Training new staff.  App. 507, 513, 819.
- Inspecting branch offices.  App. 815.
- Overseeing and reviewing TCRs.  App. 519, 525.
- Reviewing applications filed by entities seeking approval to establish and operate a national securities exchange.  App. 519.
- Scheduling and planning meetings.  App. 507, 510, 525, 791.
- Setting deadlines for staff.  App. 510, 512–13, 515, 531, 791, 793.
- Updating information in TRENDS.  App. 506, 509, 525, 787.

## B.  Moore, Monahan, Curley, and the Pay Program

Moore did not apply to the pay program.  He knew about the program, given that he could access his work email and SEC intranet, but, at the time, he was focused on caring for an ill family member.  App. 17–19, 133–37 (Moore Tr. 25:12–26:1, 28:6–19, 32:1–33:16, 34:9–35:17, 41:21–42:14).  Thus, while aware that the program had a finite application window, Moore did not submit a resume or ask for a good-cause extension.  App. 137–38 (Moore Tr. 41:21–42:1, 45:14–17).

Monahan and Curley both applied to the pay program and received pay raises in 2015.  App. 463–64.  Monahan received a 14.14% pay increase, totaling $136,555 (base pay)/$169,629 (total salary).    App. 464.  Curley received a pay increase of 8%, totaling $157,332 (base pay)/$195,438 (total salary).  App. 463.

According to Nada Smith, a Human Resources specialist at the SEC who worked on the pay program, if Moore had applied to the program, he would have received a 16.90% pay increase in 2015, totaling $140,458 (base pay)/$174,477 (total salary).  App. 463–64.

Their current salaries are approximately as follows: Moore makes around $222,000, Monahan makes around $236,000, and Curley makes around $245,000.  Am. Compl. ¶¶ 9–10, 12.

C.  Moore Discovers the Pay Disparity

Moore learned that he was being paid less than his coworkers in 2016. He found out that he could look up their salaries online and discovered the pay disparity.  App. 139 (Moore Tr. 48:3–13).

Moore contacted Lacey Dingman, the SEC's Chief Human Capital Officer.  App. 240.  Moore told Dingman about the pay disparity and that he had not applied to the pay program.  App. 240.  Dingman, Moore, and a Human-Resources attorney later met to discuss Moore's pay.  App. 242. Dingman said that she could not do anything because the program had "closed" and the SEC would not "reopen[] it."  App. 141 (Moore Tr. 55:4– 56:3).  Dingman told Moore he could file an administrative grievance, bring an Equal Employment Opportunity ("EEO") action, or apply for a different position at the SEC so that he could have his pay reevaluated as a "new" hire. App. 97 (Dingman Tr. 32:2–34:2); App. 141 (Moore Tr. 56:4–16). Moore did not apply for another position because a federal hiring freeze started in 2017.  App. 141 (Moore Tr. 57:7–17).

Moore brought and lost an EEO action at the Equal Employment Opportunity Commission ("EEOC").  Moore argued that the SEC violated the Equal Pay Act by paying two female employees—Monahan and Curley—more than him.  App. 263, 267.  The EEOC granted the SEC's summary judgment motion, finding that the pay disparity did not result from sex discrimination but from Moore's failure to apply to the pay program. App. 246–47.

III.  Procedural History

Following his EEO loss, Moore sued here and once again asserted that the SEC violated the Equal Pay Act by paying him less than Monahan and Curley.  Am. Compl. ¶¶ 3, 9–10.  Defendant moved to dismiss.  In January 2022, this court dismissed Moore's complaint for failure to state a claim under Rule 12(b)(6).  *See Moore v. United States*, 157 Fed. Cl. 747 (2022). The court held that Moore failed to plead a prima facie case of sex discrimination under *Yant v. United States*, 588 F.3d 1369 (Fed. Cir. 2009). *Id.* at 750.  Moore appealed.

The Federal Circuit reversed.  *See Moore v. United States*, 66 F.4th 991 (Fed. Cir. 2023) (en banc).  The Federal Circuit explained that *Yant*, which this court applied to dismiss Moore's claim, improperly "added an

10

extra element to an EPA claimant's prima facie case—namely, a showing that the pay differential is 'either historically or presently based on sex.'" *Id.* at 996 (quoting *Yant*, 588 F.3d at 1372). Overruling *Yant*, the Federal Circuit reversed and remanded for further proceedings. *Id.* at 997.

Further proceedings in this court followed. After the parties concluded discovery, defendant moved for summary judgment. For the reasons set out below, we grant defendant's motion. While Moore makes a prima facie case, there is no genuine dispute of material fact that his lower pay resulted from a sex-neutral factor—the pay program.

DISCUSSION

I.    Standard of Review

Summary judgment is proper when the movant "shows that there is no genuine dispute" of "material fact" and that the "movant is entitled to judgment as a matter of law." RCFC 56(a). A fact is material if it might affect the case's outcome. *Silver State Land, LLC v. United States*, 155 Fed. Cl. 209, 212 (2021). A genuine dispute exists when the fact finder may reasonably resolve the dispute in favor of either party. *Id.* We read all factual inferences in favor of the nonmoving party. *Id.*

II.    Moore Makes a Prima Facie Case

Defendant insists that Moore cannot make a prima facie case because neither Monahan nor Curley are comparators. (A comparator is someone who does the same work as plaintiff but is paid more.) As to Monahan, defendant argues she is not a comparator because she has worked for the last ten years in a different SEC practice group than Moore. For Curley, defendant reasons that she is also not a comparator because she only works part time whereas Moore works full time.

Moore responds that Monahan and Curley are comparators. He argues that merely because Monahan works in a different practice group and Curley works part time does not render them non-comparators, given that they have the same position (SK-15), the same position descriptions, are all attorneys who perform the same physical and mental work, are equally skilled in securities law, and work under identical working conditions.

11

The Equal Pay Act analysis proceeds in two steps. At the outset, plaintiff must make a prima facie case. § 206(d)(1). To do so, plaintiff bears the burden of proving that there is unequal pay. *Id.* Then, the burden shifts to the defendant to establish one of the Act's affirmative defenses—three specific and one catchall for "any other factor other than sex." *Id.* (For brevity, we refer to the catchall defense as the "sex-neutral factor.")

To establish unequal pay, Moore must prove three things. First, he "must show that an employer pays different wages to employees of opposite sexes." *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). Second, the unequally paid employees must perform "equal work on jobs" that require "equal skill, effort, and responsibility." *Id.* Third, the employees must work "under similar working conditions." *Id.*

No one disputes that Moore is paid less than Monahan and Curley. Instead, the parties contest whether Moore, Monahan, and Curley perform equal work under similar working conditions.

Under the Act, "equal work" does not mean identical work, just "substantially equal" work. *Santiago v. United States*, 107 Fed. Cl. 154, 158 (2012) (quoting *Shultz v. Wheaton Class Co.*, 421 F.2d 259, 265 (3d Cir. 1970)); *Corning*, 417 U.S. at 203 n.24 ("[I]t is now well settled that jobs need not be identical in every respect before the Equal Pay Act [applies] . . . ."). To prove equal work, Moore must identify a "comparator" for a "factor by factor" comparison. *Id.* (quoting *Strag v. Bd. of Tr.*, 55 F.3d 943, 948 (4th Cir. 1995)). While job descriptions and titles are helpful, *Kaplan v. United States*, 126 Fed. Cl. 72, 83 (2016), the "controlling factor" is "job content— the actual duties that the respective employees are called upon to perform," *Santiago*, 107 Fed. Cl. at 161 (quoting *Hodgson v. Brookhaven Gen. Hosp.*, 436 F.2d 719, 724 (5th Cir. 1970)). Actual or primary duties are those that an employee spends most of his or her time and energy on. *See Goodrich v. Int'l Brotherhood of Elec. Workers*, 815 F.2d 1519, 1524 (D.C. Cir. 1987). Actual duties do not include incidental tasks. *See id.*

Moore makes a prima facie case that he and Monahan perform equal work. To start, they share the same job title—supervisory exam manager. App. 58, 67–68. True, job titles are not "determinative," but they are "relevant." *Kaplan*, 126 Fed. Cl. at 83. Further, both are identified—and paid at—the SK-15 level. App. 59, 212, 316, 476. They also share the same position description, which details the "major duties" that they perform.

12

*See* App. 214–18; *see also Kaplan*, 126 Fed. Cl. at 83 (noting that "job classifications"—like a position description—can be "relevant" too).

Beyond job titles, Moore's and Monahan's respective supervisor evaluations reveal that they perform substantially equal work. Indeed, Moore and Monahan share many of the same tasks:

| Moore | Monahan |
|---|---|
| Drafting, editing, and reviewing documents for oversight reviews, examination documents, deficiency letters for SROs, and Section 31 inspections. App. 341–42, 361–62, 689–90, 717. | Drafting, reviewing, and editing scope memoranda, document requests, onsite interview questions, planning memoranda, inspection reports, deficiency letters, TCR closing memoranda, Section 31 inspection reports, and other written work. App. 480, 483, 849, 851, 868, 914–15. |
| Overseeing TCRs and determining appropriate responses and dispositions. App. 692, 717, 740. | Analyzing and overseeing SRO TCRs. App. 483, 849, 851–52, 857, 867, 893–94. |
| Serving as the FSIO newsletter coordinator. App. 717, 740–41, 761. | Drafting the monthly newsletter. App. 480, 483, 867, 917. |
| Entering examination documents into the TRENDS database. App. 362. | Training new staff on using TRENDS. *See* App. 870. |
| Setting exam team deadlines. App. 361, 690, 717. | Setting exam team deadlines. App. 849, 914. |

13

| | |
|---|---|
| Setting regular meetings with his exam team. App. 341, 687, 739–40, 761. | Scheduling and planning meetings. App. 849, 914. |
| Performing entrance and exit SRO interviews. App. 341, 361–62, 689, 762. | Performing onsite entrance and exit interviews with examinees. App. 480, 483, 915. |
| Planning and scoping examinations. App. 361. | Planning and scoping examinations. App. 915. |

The overlap in tasks, when read in a light most favorable to the non-moving party (Moore), *see Silver State*, 155 Fed. Cl. at 212, shows that Moore and Monahan perform substantially equal work under similar working conditions.

To be sure, there were some tasks they did not share. For example, Monahan reviewed and summarized NYSE corporate and financial compliance operating reports. App. 483. There is no record that Moore did similar work. For Moore's part, he worked on a stand-alone oversight exam matrix and managed controlled foreign corporation keyworkers, publicity, and events. App. 740, 867. Monahan does not appear to have done so.

Yet the standard is "substantially" equal, not "identical," work. *Santiago*, 107 Fed. Cl. at 158; *see also Savignac v. Day*, 539 F. Supp. 3d 107, 118 (D.D.C. 2021) (noting that a lawyer "need not establish that every associate in the Issues & Appeals group performs identical duties; she need only allege that, as a general matter, such individuals hold jobs with similar performance requirements"). Thus, even though there are peripheral distinctions between Monahan and Moore, those differences do not disturb our conclusion that they perform substantially equal work. *Cf. McGee v. Va. Dep't of Env't Quality*, 624 F. Supp. 3d 616, 630 (E.D. Va. 2022) (finding that the mere presence of "additional duties" did not affect "the amount of work encompassed by plaintiffs' core job responsibilities").

14

Defendant's arguments are unavailing. First, defendant is mistaken that Monahan and Moore cannot be comparators because they serve in separate departments. Although they work in different departments, they still perform equal work. *Cf. Spencer v. Va. State Univ.*, 224 F. Supp. 3d 449, 457 (E.D. Va. 2016) ("Plaintiff need not identify comparators in her own [college] department . . . ."). Indeed, as defendant recognizes when it comes to Monahan's and Moore's job titles, it is the work's substance—not labels—that governs our analysis.

Next, defendant does not explain why Monahan's core duties are distinct from Moore's. True, Moore does himself no favors by making generalized arguments, such as claiming that Moore and Monahan are comparators because they are "attorneys with sufficient skill in the securities laws to perform their work." Resp. 19; *see also EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 249 (2d Cir. 2014) (rejecting EEOC theory that male attorneys were comparators for female attorneys merely because "any attorney is an attorney is an attorney"). Even so, the supervisor evaluations provide a detailed record that shows—unrebutted by defendant—that Moore and Monahan perform substantially equal work.

Further, defendant's cases are distinguishable. *EEOC*, for one, involved an EEOC lawsuit over allegations that a port authority was paying female attorneys less than the male attorneys. Yet the EEOC lost because it relied "almost entirely on broad generalizations drawn from job titles and divisions." *EEOC*, 768 F.3d at 256. Here, by contrast, the record contains bountiful evidence of Moore's and Monahan's "specific duties." *Cf. Carey v. Foley & Lardner LLP*, 577 F. App'x 573, 580 (6th Cir. 2014) (noting that, in an equal pay case involving allegations that male law partners were paid more than female law partners, evidence of specific duties would include "taking and defending depositions, drafting motions or briefs, conducting internal investigations, negotiating, managing client relationships, etc."); *Savignac*, 539 F. Supp. 3d at 118–19 (dismissing claim because plaintiff did not allege that she performed the same specific tasks as her comparators, such as drafting Supreme Court briefs or working with partners to draft memoranda).

Defendant's reliance on *McGee* is likewise misplaced. There, the court found that an individual was not a comparator because his duties constituted "significant additional work" beyond the plaintiff's "the core

duties." 624 F.3d at 629. Here, there is no evidence that Monahan has "significant additional work" beyond the "core duties" she shares with Moore. Indeed, defendant's remaining cases are inapposite for similar reasons. *See Blackwell v. United States*, 171 Fed. Cl. 682, 689–90 (2024) (finding that border patrol manager did not perform the same work as a border patrol security coordinator), *appeal filed*, No. 24-2190 (Fed. Cir. 2024); *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 695–96 (7th Cir. 2006) (holding that plaintiff's supervisor was not a comparator because he had company-wide and supervisory tasks that she did not), *cert. denied*, 551 U.S. 1130 (2007) (mem.).

Because the Equal Pay Act only requires that there be one comparator, we do not address whether Curley is also a comparator. *See Cooke v. United States*, 85 Fed. Cl. 325, 343 (2008) ("[P]laintiff[s] need not compare [themselves] to all similarly classified" but "may *choose* one or more among those allegedly doing substantially equal work" (quoting *Ellison v. United States*, 25 Cl. Ct. 481, 487 (1992))), *appeal dismissed*, 352 F. App'x 429 (Fed. Cir. 2009) (mem.).

Given that Moore makes a prima facie case of sex discrimination, the burden shifts to defendant to establish an affirmative defense.

III.    Defendant Establishes Its Affirmative Defense

Defendant argues that it has an affirmative defense because Moore's pay is lower due to a sex-neutral factor: the pay program. Initially, defendant notes that circuit courts split over what constitutes a sex-neutral factor. Some require that the sex-neutral factor result from a legitimate business reason; others hold that any sex-neutral factor is enough.

Defendant contends that it prevails under either approach. Defendant maintains that Moore is paid less because he did not apply to the pay program, whereas Monahan is paid more because she did. As a result, defendant concludes, the program is a sex-neutral factor which explains Moore's lower pay. Further, defendant argues that the SEC had legitimate business reasons for how it structured the program. Specifically, the SEC needed up-to-date resumes and a fixed application deadline to conserve time and money.

Moore responds that the pay program is not a sex-neutral factor. First, Moore construes defendant's affirmative defense argument to be a waiver argument and claims that he cannot waive his equal pay claim. Next, he argues that the program was not related to a legitimate business reason, which is the test he urges this court to adopt. Moore also claims that granting him a raise would not require reopening the program, just equalizing his salary. Further, Moore reasons that reviewing his application would not be laborious or expensive.

The Equal Pay Act has four affirmative defenses. *See* § 206(d)(1). Unequal pay will not violate the Act if it results from either (1) a seniority system, (2) a merit system, (3) a system that measures earnings by quantity or quality, or (4) a sex-neutral factor. *Id.*

Courts dispute what constitutes a sex-neutral factor. Some require the sex-neutral factor to be rooted in a legitimate business reason. *See, e.g.*, *Rizo v. Yovino*, 950 F.3d 1217 (9th Cir. 2020); *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520 (2d Cir. 1992); *EEOC v. J.C. Penny Co.*, 843 F.2d 249 (6th Cir. 1988); *Glenn v. Gen. Motors Corp.*, 841 F.2d 1567 (11th Cir. 1988). Others impose no such limit. *See, e.g.*, *Taylor v. White*, 321 F.3d 710 (8th Cir. 2003); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446 (7th Cir. 1994). The Federal Circuit has not taken a position. *See Moore*, 66 F.4th at 998 n.6.

We find that, under either approach, the pay program is a sex-neutral factor which explains Moore's lower pay.

A. The Pay Program Is a Sex-Neutral Factor

To qualify as a sex-neutral factor, "it is enough that the factor be gender-neutral on its face and bona fide—that is, used in good faith and not in a discriminatory manner . . . ." *Behm v. United States*, 68 Fed. Cl. 395, 400 (2005). To succeed, the employer must show that the wage difference resulted from the sex-neutral factor. *Urban v. United States*, No. 20-1600, 2025 WL 1244438, at *8 (Fed. Cl. Apr. 30, 2025). It is insufficient that the proffered sex-neutral factor "*could* explain the wage disparity." *Boyer v. United States*, 97 F.4th 834, 844 (Fed. Cir. 2024) (quoting *Riser v. QEP Energy*, 776 F.3d 1191, 1198 (10th Cir. 2015)), *reh'g denied*, 98 F.4th 1073 (Fed. Cir. 2024) (mem.). Instead, the sex-neutral factor must "*actually* motivate[] the decision to set unequal pay." *Id.*

17

The pay program is a sex-neutral factor that explains Moore's lower pay. The SEC did not limit the program to female employees, nor did it give them preferential treatment. Indeed, the only difference between Moore and Monahan is that Moore did not apply to the program and Monahan did. And Moore admits that he could have applied or asked for a good-cause extension. *See* App. 134–36, 138 (Moore Tr. 29:17–35:6, 45:14–17). He did neither. Thus, the program is not just a possible explanation for Moore's lower pay; it is *the* reason that Moore is paid less than Monahan.

Our decision in *Gordon v. United States* is instructive. 130 Fed. Cl. 604 (2017), *aff'd*, 903 F.3d 1248 (Fed. Cir. 2018), *vacated*, 754 F. App'x 1007 (Fed. Cir. 2019) (mem.). There, Veteran Affairs had a three-member panel that fixed compensation for each Veteran Affairs physician on an individualized basis. *Id.* at 606. The panel relied on the physicians' current resumes to make pay decisions, and so it required physicians to submit updated resumes for the panel's review. *Id.* Two female physicians did not submit the required resumes, and as a result did not receive pay raises before a government-wide pay freeze. *Id.* Some of their male colleagues, by contrast, received a pay raise after they submitted their resumes. *Id.*

This court held that the disparity did not violate the Equal Pay Act. Rather, the pay disparity resulted from the sex-neutral combination of the pay freeze and the female physicians' failure to timely submit their resumes. *Id.* at 611. Indeed, this court noted that "timely cooperation with [Veteran Affairs' resume] requirements would have likely guaranteed substantial raises for both plaintiffs." *Id.*

So too here. The reason why Moore's pay is lower is not discrimination. His pay is lower because he did not apply to the pay program. As Nada Smith noted, if Moore had applied to the program, he would likely be paid on par with Monahan. *See* App. 463–64.

Moore does not earnestly dispute that his failure to apply to the pay program is what caused his lower pay. Instead, Moore attempts to dodge § 206(d)(1)'s plain import by arguing that (1) defendant's affirmative defense argument is really a waiver argument, and (2) this court should require defendant to establish that his lower pay resulted from a legitimate business reason.

To start, Moore says he cannot waive his equal pay claim—which is true, but beside the point. Defendant does not argue that Moore waived his

18

claim, only that Moore's failure to apply to the pay program is a sex-neutral factor which explains the pay disparity. Thus, contrary to Moore's suggestion, we do not believe that Moore's conduct—or, more accurately, non-conduct—waived his claim. All we hold is that the program is a sex-neutral factor that explains why Moore's pay is lower than Monahan's.

Moore also asserts that *Gordon* is inapposite, but that is mistaken too. Moore first argues that the Federal Circuit vacated our decision in *Gordon*. That is incorrect. The Federal Circuit, pursuant to a voluntary dismissal of appeal after the petitioner moved for rehearing en banc, only vacated its earlier "opinion and judgment," not this court's. *See Gordon*, 754 F. App'x at 1008. Indeed, Rule 42 of the Federal Rules of Appellate Procedure confirms that "[a] court order is required for any relief . . . [under the rule] beyond dismissal of an appeal—including . . . vacating an action of the district court . . . ." Fed. R. App. P. 42(b)(3). Failing that, Moore insists that *Gordon* is inapposite. While *Gordon* involved some different facts—for example, a periodic pay panel there as opposed to the one-time pay panel here—the case's similarities support our conclusion that the pay program is a sex-neutral factor which explains Moore's lower pay.

Next, Moore urges a different interpretation of § 206(d)(1). He argues that the sex-neutral factor must be more than just sex neutral. According to Moore, defendant must show that the pay program flows from a legitimate business reason.

Not so. Even if § 206(d)(1) required a legitimate business reason, Moore still loses (see below). But the better interpretation is that the section contains no such requirement. *See Cooke*, 85 Fed. Cl. at 349 (noting that this court generally allows an affirmative defense if the factor is "gender-neutral on its face and applied in a good faith, non-discriminatory manner").

The plain meaning of § 206(d)(1) is that defendant need only show that a sex-neutral factor motivated the pay disparity. *See Behm*, 68 Fed. Cl. at 400. For one, that is what the statute says. So long as there is *any* sex-neutral factor, defendant has a defense. *See* § 206(d)(1); *see also Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 518–19 (2d Cir. 2023). And the plain import of "any" is that it includes all sex-neutral factors applicable in the government employment context, not just legitimate business ones. *See Behm*, 68 Fed. Cl. at 400; *see also* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 101, 103 (2012) ("Without some indication to the contrary, general words," such as "any," "are to be

accorded their full and fair scope," "not . . . arbitrarily limited"). Thus, we cannot read a legitimate business rule into the statute that is not there.

Moreover, probing whether an agency exercised "legitimate" business judgment is beyond our purview. Indeed, "[u]nder the Equal Pay Act, the courts . . . are not permitted to 'substitute their judgment for the judgment of the employer . . . .'" *Washington County v. Gunther*, 452 U.S. 161, 170–71 (1981) (quoting 109 Cong. Rec. 9209 (1963)); *see also Wernsing v. Dep't of Hum. Servs.*, 427 F.3d 466, 468 (7th Cir. 2005) ("Section 206(d) does not authorize federal courts to set their own standards of 'acceptable' business practices."). Yet to inquire whether an agency's judgment was "legitimate" would do just that. *See Behm*, 68 Fed. Cl. at 400.

Further, courts that apply the legitimate business rule do so by ignoring § 206(d)(1)'s text. For example, one of the leading cases supporting the legitimate business rule, *Aldrich v. Randolph Central School District*, dispensed with parsing § 206(d)(1)'s text and resorted to stitching together the section's legislative history and Congress' "general policy goals" to justify the rule that "factor other than sex" really means "legitimate business reason." *See* 963 F.2d at 524–26. And *Kouba v. Allstate Insurance Company*, which invented the legitimate business rule, asserted—without explanation—that a sex-neutral factor must be "business-related." *See* 691 F.2d 873, 876–77 (9th Cir. 1982), *overruled on other grounds*, *Rizo*, 950 F.3d at 1229; *see also Wernsing*, 427 F.3d at 468 (explaining that the legitimate business rule "originated" from *Kouba* without explanation of "its genesis").

Such atextual interpretations are improper. When "judges create atextual legal rules," those "[j]udge-made doctrines" "distort the underlying statutory text, impose unnecessary burdens on litigants, and cause confusion for courts." *Ames v. Ohio Dep't of Youth Servs.*, No. 23-1039, slip op. at 1 (U.S. June 5, 2025) (Thomas, J., concurring). We, then, must apply § 206(d)(1) as written and decline Moore's invitation to saddle the text with an atextual restriction.

B.  Legitimate Business Reasons Support the Pay Program

Even if we applied the legitimate business rule, Moore would still lose.  *See Lissak v. United States*, 49 Fed. Cl. 281, 285 (2001) (applying the legitimate business rule "for argument's sake").  Under that rule, the sex-neutral factor must result from a legitimate business reason.  *Id.* at 284.  What constitutes a legitimate business reason is unclear, especially in the context of government employment, but it at least entails "[a] pragmatic standard" that protects against sex discrimination while "accomodat[ing] employer discretion," requiring "the employer" to use the allegedly non-sex factor "reasonably in light of the employer's stated purpose."  *Kouba*, 691 F.2d at 876.

As structured by the SEC in 2014, the pay program rests on at least two legitimate business reasons.

First, the SEC had a legitimate business reason to require applicants to submit up-to-date resumes.  The SEC needed up-to-date resumes because they provided "extensive detail" that would be lacking in other sources, such as performance work plans or employee personnel files.  App. 101–04 (Dingman Tr. 61:2–12); App. 123 (Smith Tr. 67:18–68:1).  For example, when Smith reviewed Moore's personnel records after he filed his EEO complaint, she could only make a "general estimate because there [was] no detailed description of [Moore's] work."  App. 121–22 (Smith Tr. 61:1–7).  And if the SEC had not required resumes, that problem would have been compounded across the approximately 1,600 employees who applied to the program.  App. 159.

Second, the SEC had a legitimate business reason at the time[6] to limit the pay program's application window.  As it was, the program took months to complete, required almost one hundred personnel to review applications, and cost roughly seven times its estimated price ($21 million instead of $3 million).  App. 102, 149.  Thus, between the budget and personnel

---

[6] Moore concedes that the program was facially sex-neutral in 2014 but insists that it later became discriminatory as applied to Moore when he received lower pay.  *See* Oral Argument at 28:38–30:17.  Properly understood, the question is not whether the SEC had a legitimate business reason to pay Moore less at some unspecified date after 2014.  Instead, the question is whether the SEC had legitimate reasons to structure the program the way it did in 2014.

21

constraints, it would have been "very difficult to keep offering the program over and over again." App. 102 (Dingman Tr. 52:19–25). In the SEC's judgment, the way to limit costs was to set a one-time application window.

In short, the pay program was rooted in the SEC's legitimate goal of stewarding its financial and human resources. And while true that it is not "uncommon for government employment policies to reflect characteristics other than good business sense," *Behm*, 68 Fed. Cl. at 400, "an employer's desire to save money"—taxpayer money, at that—"constitutes a legitimate business related reason," *Lissak*, 49 Fed. Cl. at 287 ("Achieving economy in government, however elusive a goal, is also a most desirable aspiration.").

Moore's counterarguments fall short. While Moore claims that this court merely needs to direct the SEC to equalize his pay, with no need to reopen the pay program, that would not be such a decision's practical effect. If Moore can force the SEC to equalize his pay after he did not apply to the program, what is to stop the roughly 1,400 SEC employees who did not apply from also taking a second bite at the cherry? Although Moore insists that a favorable decision would only benefit him, there is no reason others could not do the same. Besides, the size of Moore's ask has no bearing on whether the SEC has a legitimate reason to pay Moore less.

Moore also asserts that "funding for pay transition was not limited," but that is incorrect. Resp. at 28. As it was, the program cost seven times its estimated cost. App. 149. Practically, reopening the program for Moore (and likely those who would come after) would require further outlays of time and money. So even if it cost only a pittance to adjust Moore's salary, that does not make the SEC's decision to save taxpayer money an illegitimate one. *See Lissak*, 49 Fed. Cl. at 287.

In sum, while adjusting Moore's salary may have required "minimal effort[ and] no great expense," Resp. 35, that is not the relevant question. The question is whether the sex-neutral factor (the pay program) resulted from legitimate business reasons at the time. It did.

IV.    The Pay Program Was Not Pretextual

Some courts claim that after the defendant establishes an affirmative defense under the Equal Pay Act, the burden of production shifts again, such that plaintiffs must rebut the defense by showing that it is pretextual. *See, e.g.*, *Boyer v. United States*, 159 Fed. Cl. 387, 403 (2022), *overruled on other grounds*, 97 F.4th 834 (Fed. Cir. 2024); *Schleicher v. Preferred Sols., Inc.*, 831 F.3d 746, 752–53 (6th Cir. 2016) ("We have read [the Act] to establish a three-step burden-shifting scheme . . . . [so] if a[] . . . defendant proves an affirmative defense, [the] . . . plaintiff 'must come forward with evidence demonstrating the existence of a triable issue of fact' regarding pretext." (quoting *Timmer v. Mich. Dep't of Com.*, 104 F.3d 833, 844 (6th Cir. 1997))).  The parties accept that the Act has a pretext step and have briefed the issue.

We are not so sure, as there are ample grounds for doubting whether the Act has a pretext step.  Critically, the pretext step is not in the Act's text. *See* § 206(d)(1) (not mentioning a pretext step); *see also Corning*, 417 U.S. at 195–96 (explaining the Act's shifting burden of proof without mentioning a pretext step); *Stanziale v. Jargowsky*, 200 F.3d 101, 108 (3d Cir. 2000) (recognizing that the Act "follow[s] a two-step burden-shifting paradigm").  Any analysis of pretext, then, should be done when weighing whether the defendant can establish one of the Act's four defenses.  It should not be done as a standalone (and atextual) step that shifts the burden of proof back to the plaintiff.

Even if we accepted, for argument's sake, that the Act has a pretext step, there is no evidence of pretext.  Moore does not point to any evidence which shows that the pay program was pretextual.  In fact, when asked whether anything came "to mind that leads you to believe SEC has paid you less because you are a man," Moore responded, "Specifically—I don't believe so, no."  App. 144 (Moore Tr. 69:13–18); *cf. Borovicka v. United States*, 168 Fed. Cl. 534, 546 (2023) (finding that three isolated, sexist comments—without more—did not establish pretext), *appeal filed*, No. 24-1429 (Fed. Cir. 2024).  Nor does Moore adduce any circumstantial evidence to show that the program is pretextual.  *Cf. Behm*, 68 Fed. Cl. at 400 (suggesting that a "particular wage policy" might suggest pretext if it "was highly disproportionate in its effect on the two genders").

CONCLUSION

Because Moore did not overcome defendant's affirmative defense, we do not need to address whether Moore's pre-2019 claims accrued within the statute of limitations. Accordingly, we grant defendant's motion for summary judgment. The Clerk of Court is directed to enter judgment accordingly. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge